FILED

2018 JUL 25 P 1:08

CLERK
US BANKRUPTCY COURT
ALEXANDRIA, VA

In the

United States Bankruptcy Court

for the Eastern District of Virginia

Alexandria Division

------------------------------------------------

In re: Elizabeth H. Coomes,      :  Case No: 17-13497-BFK
   Debtor           :  Chapter 13
                :

## REQUEST FOR CONTINUANCE AND SUPPLEMENT TO DEBTOR'S REPLY TO BANK OF NY MELLON'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY IN THE MATTER OF *ELIZABETH H. COOMES*

COMES NOW the Debtor, in proper person, in this her supplement to her reply to the Bank of NY Mellon's Motion for Relief from the Automatic Stay. In support thereof, Debtor states:

1. One of the unforeseen post-petition good cause reasons Debtor fell behind on her payments to the servicer was unlawful termination by her former employer on March 5, 2018, which is the subject of pending NLRB charges.

2. Debtor has subsequently received the following Order from the NLRB (See attached NLRB Order dated July 19, 2018). The case is being transferred from the Milwaukee region (employer location) to the DC region.

3. Debtor also has recently received the affidavit of her former colleague SE (attached). SE outlines the other concerted protected activity Debtor alluded to. The former employer's account assignments in the region were not equitable. The employer was sending in sales reps from out of state to sell the high revenue accounts in the DC area and assigning the small, low revenue accounts in high crime areas to Debtor and SE. For example, one large account that was

assigned to an out of state sales rep generates $3-5,000 annually in sales rep income. The practice of sending in sales reps from out of state to sell the high revenue accounts greatly harmed Debtor and SE's incomes. Debtor was making more money working for the company in Indiana than when she relocated back to the DC area. Working in the DC area ought to have produced higher income.

4. Debtor is unable to share her own 20+ page NLRB affidavit because it is labeled a confidential law enforcement document by the NLRB at this time, but will be able to produce it if this Court orders it.

5. Debtor is a lay person with ADA covered disabilities who recently lost her counsel unexpectedly last week. This is a very complicated matter. Due to her disability, lack of legal training and short timeframe, Debtor needs additional time and some legal help to prepare a complete response to the motion (a memorandum of law) and adequately prepare for the hearing. She makes the request for a continuance in part pursuant to the ADA. Debtor also needs enough time to subpoena two witnesses. Debtor is scheduled for medically necessary treatment at Mayo Clinic between July 30 – August 10, 2018 (and may possibly be there a little longer). She requests a continuance for good cause. She will have *pro bono* help from a local lawyer with expertise in this area of the law, however, he is out of town until July 30 <u>(see attached email out of the office reply from attorney Chris Brown).</u> Debtor is also consulting with another lawyer with expertise in this matter, whom she has not been able to meet with yet. It also seems to make sense to continue this motion for practical reasons since the court dismissed the bankruptcy and is hearing the motion to reconsider later. If the court were to hear this motion August 1 and then uphold the dismissal, Debtor would suffer unnecessary further financial setback as she would be charged the bank's legal fees for the hearing (preparation, travel time and court time) by the

servicer. Also, Debtor has to complete the appeal brief for the Maryland Court of Appeals and complete and the deadline to file the US Supreme Court cert petition is August 24. She is overwhelmed.

Lastly, it would seem that to the extent the bankruptcy has been dismissed and the motion to reconsider has not yet been decided, there is no automatic stay in place right now, so the Bank of NY Mellon motion for relief from the stay is equitably moot. Debtor would object to it being heard August 1 on the basis of there being no case or controversy at the present time. Debtor would incur unnecessary expense, loss of time and stress. Perhaps denying the motion without prejudice would be appropriate for now. Debtor prays for that.

If Debtor's motion to reconsider the dismissal is later granted and Bank of NY Mellon re-files their motion, Debtor prays the Court will schedule a status conference and reschedule the motion to a date certain convenient for all parties.

WHEREFORE, Debtor prays the Court will deny the motion to reconsider without prejudice at this time, or continue the motion for now and deny Bank of NY Mellon *et al* relief from the automatic stay and other such relief as appropriate and just.

RESPECTFULLY SUBMITTED,

*/s/ Elizabeth H. Coomes*
Elizabeth H. Coomes

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of July 2018 I caused a copy of the foregoing paper to be served, by first class mail, postage prepaid or ECF upon:

Thomas Gorman
Chapter 13 Trustee
300 N. Washington St.
Suite 400
Alexandria, VA 22314
Phone: (703) 836-2226

United States Trustee
115 S. Union Street
Suite 210
Alexandria, VA 22314

Malcolm B. Savage, III
Counsel for Bank of NY Mellon
Shapiro & brown, LLP
501 Independence Parkway, Suite 203
Chesapeake, VA 23320

*/s/ Elizabeth H. Coomes*
Elizabeth H. Coomes

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD

In the Matter of

Liturgical Publications, Inc.

and

Case 18-CA-222430

Elizabeth Coomes, an Individual

ORDER TRANSFERRING CASE
FROM REGION 18 TO REGION 5

Case 18-CA-222430, having been filed with the Regional Director for Region 18, and the General Counsel of the Board having duly considered the matter, and deeming it necessary in order to effectuate the purposes of the National Labor Relations Act, and to avoid unnecessary costs and delay,

IT IS HEREBY ORDERED, in accordance with the Rules and Regulations of the National Labor Relations Board, that Case 18-CA-222430 be, and hereby is, transferred to and continued in Region 5.

Peter B. Robb
General Counsel

Dated: July 19, 2018
at Washington, DC

cc:   Region 5, Region 18

AFFADAVIT OF S████ E████

In Re: Liturgical Publications, Inc. (LPI) NLRB case 18-CA-222430

July 16, 2018

1. My name is S███ E██████
2. I am over the age of 18 and competent to testify in the above referenced manner.
3. I work as a Teacher for Fairfax County Public Schools.
4. I reside at ████████████████████████
5. I began working for Liturgical Publications, Inc. (LPI) on May 5, 2017.
6. When I interviewed with Mike McAleer, the top ASE at LPI, he indicated that I would "easily bring in a six figure income" because the DC area is a "great market."
7. When I interviewed with my manager Kelly Carnevale, she indicated to me that I would be working at the churches in DC, Maryland and Virginia. I made good faith reliance upon the representations of McAleer and Carnevale, to my detriment.
8. My actual income was in the range of $38K per year, before taxes.
9. When I interviewed with Carnevale, she indicated to me that the last ASE in my jurisdiction (Kim Diamond) had been promoted within the company. I later learned that this was a lie. Diamond had been terminated.
10. When I travelled for training with McAleer I noticed that he worked part time 9 am – 3pm.
11. McAleer travelled all over the country calling on the highest earning accounts.
12. When I was working in one of McAleer's former churches I noticed that there had not been any sales in several years. He indicated that he had either worked the account from home or not at all.
13. When McAleer brought in a large client he was supposed to receive a bonus for a year, however he continued to receive a percentage of the renewals in following years, despite not being company policy. McAleer also received other special treatment, including a rental car for nearly all of his work assignments. Furthermore, when McAleer came to the DC metro area, he was unhappy with his hotel. Carnevale allowed him to stay at a nicer hotel. LPI's hotel per diem was only $70 per night, including tax.
14. In June 2017, I began questioning my account assignments with Carnevale after I learned that the large, profitable church accounts in the DC metro area were assigned to out of state ASE's. I again approached Carnevale about the account assignments. Carnevale promised to re-assign some of these accounts to me, including Holy Family Church in Dale City, Virginia. Carnevale later also committed in writing to re-assigning Holy Family Church to me.
15. I first met Elizabeth Coomes in early September 2017 at the Kahlahari Resort in Ohio when we both attended a team building seminar there together.
16. When I met Coomes, Carnevale indicated to me that Coomes would be relocating to Virginia and joining our team in early October. At this time Alethia Hughes was also a member of our team; she was located in the DC metro area.
17. Alethia Hughes, Coomes and I were briefly on a DC area sales team for LPI.

SE

18. LPI historically had only 2 sales reps in the DC Metro area, but Carnevale assured us there would be three sales reps in the area once Coomes joined the team. Carnevale told Coomes she did not need three ASE's in the DC metro area, but would make it work when Coomes came.
19. Within days of Coomes coming to the DC area in October 2017, Alethia Hughes was terminated before the end of a 90 day PIP that had been implemented for her.
20. I spoke with Carnevale about the termination and she indicated that Alethia was "not a good fit". Carnevale assured me that Alethia was not terminated because Coomes had joined the team.
21. Alethia's termination served to increase contact between Coomes and myself. We decided to stay in almost daily communication through text, email and phone to share our successes and challenges, as a way of supporting each other.
22. In October, our colleague Mike McAleer commented on a conference call that advertisers "threw money at him" when he came to the DC area to sell ads.
23. I found his comment to be inflammatory and led me to further question why out of town Advertising Sales Executives (ASE'S) were coming into our sales jurisdiction.
24. This prompted Coomes and I to begin discussing approaching our manager about account distribution.
25. Our concerns were that the higher earning accounts were saved for out of town ASE's and this practice was harming our incomes.
26. Also around the same time October 10-12, 2017, I was working at a church in Baltimore city, in a high crime neighborhood, where I felt unsafe. I had to walk several blocks from my hotel to my assigned church.
27. I raised concerns with both the church staff and my manager Carnevale about the safety of my working environment. My manager was dismissive.
28. I recall later reading an article and sending it to my manager about rampant violent crime in Baltimore.
29. In October 2017, we learned that our manager Carnevale was coming to town to visit with us. Coomes and I talked extensively about how best to approach our manager about the issue of outside ASE's working on our local churches.
30. We met together with Carnevale on or about October 31, 2017 in Takoma Park, MD at a co-working site.
31. Coomes and I were together with Carnevale and I initiated the conversation to address our concerns about account distribution and outside ASE's.
32. We expressed concern that it was not good business practice to send out of state ASE's to our area and have to pay per diem, hotel, flights, car rentals, and other associated costs when we lived nearby.
33. Coomes and I also stated that we were both raised Catholic and had established relationships with churches that other ASE's were servicing.
34. In addition, being raised in the area and due to our past sales jobs, we both had extensive local business contacts. We could continue to sell ads year-round on these accounts since we were local.
35. Since we were local, we also knew priests and staff at many of the local churches as there is some mobility in the Diocese.



36. When I found out that Stewardship Communications Consultant (SCC) was having trouble getting into the church I grew up in, I made a call to the staff telling them I worked for LPI, soon after he was able to schedule a meeting with them.
37. Carnevale was not receptive to me helping our SCC and growing our publications business in our area.
38. When approached at our meeting in Takoma Park about account assignments, Carnevale was defensive and adamant that the out of town ASE's would be keeping these accounts.
39. I expressed concern and astonishment at this response.
40. Carnevale expressed that she was not going to change account assignments and gave no explanation except to say that she felt McAleer had established relationships with these churches. When LPI signed a contract with a new church Saint Ambrose in Annandale, Virginia, I later learned from the SCC at LPI that Carnevale did not intend to assign it to myself or Coomes even though my sister attends Saint Ambrose Church and Coomes grew up in Annandale, Virginia.
41. Carnevale then asked me to step out of the room while she talked to Coomes independently.
42. I overheard Coome's conversation with Carnevale where she said that Coomes needed to "prove herself" and "pay her dues" prior to earning more money, promotions etc. She indicated that her own promotion took three years. Coomes told Carnevale that she had recently separated from her husband and did not have the luxury of time; she needed to improve her income very soon. Coomes indicated that she had many years of sales experience, she had been one of the top insurance producers in the region and was capable of selling the larger accounts.
43. At that time I also overhead Carnevale say that this job may not be a "good fit" for Coomes. At that time, Coomes was the top new ASE in the company and had consistently exceeded sales goals. Coomes indicated to Carnevale that she had extensive sales experience and wanted to succeed with LPI.
44. Workplace security continued to be an issue for our team, with Coomes experiencing credit card fraud in Baltimore when purchasing a meal for church staff. Baltimore had become the murder capital of the United States with nearly one murder per day. Two unrelated homicide victims were relatives of two of Coomes' high school friends.
45. I specifically mentioned to Carnevale that there had been a shooting near one of my Maryland churches and I noted that the staff were continuing to leave me alone in the building, I was concerned for my safety. Another church I worked at was located in an area known as a body dumping ground. It was so difficult to sell ads in these church bulletins that Carnevale had me going there multiple times per year to try to sell ads.
46. Coomes and I continued to talk with each other and our manager about workplace safety/security as well as equitable account assignments in order to improve our working conditions and income. We became concerned about apparent gender bias with the account assignments, as our manager was assigning the best accounts to three men on our team. All of the ASE's on our team had extensive sales experience and were fully capable of selling the accounts in their areas. Our conversations with Carnevale were respectful and professional.
47. In late November/early December 2017, I went to Boston for LPI's digital training. Several employees went to dinner with Carnevale at a Boston restaurant called the Whisky Priest. Carnevale volunteered that she had a criminal history. She mentioned she had been arrested



and charged with possession with the intent to distribute. It was not clear how her criminal case was decided.
48. Coomes and I discovered that Carnevale had an ASE position open in suburban Maryland in our sales jurisdiction. It was advertised on the LPI website.
49. We grew concerned because history indicated that this sales area did not employ three ASE's and our market share had not changed.
50. We had anticipated that the DC metro area accounts Servaas Verbiest had serviced would be re-assigned to us after he was promoted to management. In the new year we were assigned a "Book of Business" and Coomes and I were surprised that nothing had really changed. There was only one high earning account on my roster and 25% of Coomes' accounts were in Baltimore. Coomes expressed to me she was deeply concerned for her personal safety and afraid to go work in Baltimore, given the rampant violent crime.
51. Nothing had changed even though I had been promised higher earning accounts in Northern Virginia where I had personal connections.
52. On January 17, 2017, Coomes informed me that she had a call with Carnevale, to discuss equitable account assignments and workplace safety. I requested to Coomes and Carnevale that I wanted to be a part of it. Carnevale said I was not to be part of that phone call.
53. On January 23, 2017, we had our weekly ASE team conference call and our team mate Chad Briedinger indicated that he was down the road from Coomes and I in Dale City, Virginia working with Holy Family Church, a church that Carnevale had promised to re-assign to me. I also knew the priest at Holy Family Church.
54. I stated that I was surprised and unsure as to why he was flying/driving in from out of state when Coomes and I live in the immediate area.
55. Chad became very defensive and verbally upset and said that I needed to "take it up with Kelly."
56. Coomes indicated the same sentiment as I did and complained that 25% of her accounts were low revenue accounts in Baltimore. Breidinger was very hostile, arrogant and condescending towards us. He defended the practice of sending out of state ASE's to our area and suggested we were not capable of selling the larger accounts in our jurisdiction. Coomes took exception to that using logic and facts.
57. The conference call continued as usual. Every ASE spoke about their sales week and any concerns they had. The conference call was not "derailed" by the discussion I initiated with Breidinger, which Coomes participated in.
58. The January 23, 2018 conference call ended.
59. Chris Reeves, the ASE who was leading the call in Carnevale's absence, later indicated to me privately that she too had ASE's come into her sales area and was not sure why that was happening. She expressed that she was "fed up" with this happening.
60. Within days, Carnevale scheduled a February 2, 2018 call with me to put me on a Performance Improvement Plan (PIP).
61. To my knowledge, only Coomes and I were approached with a PIP by Carnevale. The PIP was apparent retribution for speaking up on the January 23, 2018 call, when she was absent, as well as our other efforts working together and speaking up to improve our income, account assignments and workplace safety.
62. On February 2, 2018, Carnevale said I was to sign the PIP plan immediately and that it would be part of my employment record. The PIP required me to produce more sales per week than my

*SE*

contract required. It was designed to make me fail to ultimately enable LPI to terminate my employment. Furthermore, Carnevale had not provided me with additional training and coaching, which is required pursuant to my contract before implementing a PIP.

63. I indicated to Carnevale that in several decades of work I had never been on a PIP and did not intend to start now. I stated that the reason I was having difficulty making my sales production requirements was the unfair account assignments. My assigned churches were small and it was a very tough sell to generate advertising sales. Carnevale told me that I ought to lie to the prospective advertisers and tell them that these small churches were 2,000 member congregations. I was not willing to lie to make sales.

64. Shortly thereafter I sent in my resignation effective February 16, 2018, which was accepted via email. LPI terminated my email and system access soon after I sent in my resignation, but before my resignation effective date.

65. I hereby attest that the aforegoing statement is true under penalty of perjury.

_____          7/16/18
S███ E███                          Date

#1 State of __VA__
County of __Fairfax__
#2 The foregoing document was acknowledge before me this #3 16th day of __July__ 2018 by
#4 __S███ E███__ who personally appeared who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument

_____
S███ E███

#5 _____
Notary Signature

DUNCAN DELOACH
Notary Public 7710189
Commonwealth of Virginia
My Commission Expires 02/28/2021

SE



UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
___Alexandria___ Division

In re: **Elizabeth H. Coomes**

Debtor(s)

Case No. **17-13497-BFK**
Chapter **13**

Plaintiff(s)

v.

Defendant(s)

Adversary Proceeding No.

## CERTIFICATION UNDER LOCAL BANKRUPTCY RULE 2090-1

Document Title: **Request for Continuance + Supplement to Motion for Relief**
Date Document Filed: **7/25/18**
Docket Entry No.

I declare under penalty of perjury that (Check one box):

☒ No attorney has prepared or assisted in the preparation of this document.

☐ The following attorney prepared or assisted in the preparation of this document.

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)

Name of Pro Se Party (Print or Type)    Name of Pro Se Party (Print or Type)

*/s/ Elizabeth H. Coomes*
Signature of Pro Se Party              Signature of Pro Se Party

Executed on: **7/25/18** (Date)

[2090cdva v ex. 09/17]